## In re ROXFORD FOODS LITIGATION.

### Nos. CV-F-89-846 REC, CV-F-91-009 REC and CV-F-91-010 REC.

United States District Court,
E.D. California.

Oct. 7, 1991.

---

Malcolm Leader–Picone, Sheppard, Mullin, Richter & Hampton, San Francisco, Cal., for Purina.

D. Gregory Durbin, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., for Poultry Transport.

Timothy Jones, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., for Orlopp Turkey Breeders.

Philip J. Norgaard, Dietrich, Glasrud & Jones, Fresno, Cal., Steven G. Johnson, Norbest Inc., Midvale, Utah, for Norbest.

John P. Eleazarian, Kimble, MacMichael & Upton, John H. Baker, Baker, Manock & Jensen, Fresno, Cal., for John Tutelian.

Howard Alan Sagaser, Jory, Peterson & Sagaser, Fresno, Cal., for Clifford Tutelian.

Douglas Eugene Noll, Lang, Richert & Patch, Fresno, Cal., for Civic Center Square.

Vernon C. Watters, San Francisco, Cal., for Credit Agrico.

Albert J. Berryman, III, Lerrigo, Nibler, Berryman, Coleman & Bennett, Fresno, Cal., for Farm Credit Leasing.

Chris Pilegard, Fresno, Cal., for Jensen & Pilegard.

Dan L. Carroll, Downey, Brand, Seymour & Rohwer, Sacramento, Cal., for Louis Rich.

Stuart M. Gerson, U.S. Dept. of Justice, Washington, D.C., for AGRI.

## ORDERS RE MOTIONS

COYLE, Chief Judge.

On October 7, 1991, the court heard Purina Mills, Inc.'s Motion for Summary Judgment, Norbest, Inc's Counter–Motion for Summary Judgment, Norbest, Inc's Motion to Strike Evidence, and the United States Department of Agriculture's Motion for Leave to File Amicus Brief.

Upon due consideration of the written and oral arguments of the parties and the record herein, the court issues its rulings with respect to these motions for the reasons set forth herein.

### A. *Motion to Strike.*

Norbest moves to strike numerous averments in the respective declarations of Mark A. Lakers, Carl Nethers and Malcolm Leader–Picone and certain portions of the deposition testimony of William Rittenhouse, Clifford Tutelian, and James L. Leong, asserting with respect to each objection a mishmash of grounds, many, if not all of which are aptly described by Purina as nitpicking and hypertechnical. The court will add time-wasting and meritless. The court has reviewed the challenged portions of the respective affidavits and depositions and simply cannot agree that they should be stricken.

Consequently, this motion is denied.

### B. *Motions for Summary Judgment.*

The primary issues involved in these motions are whether, under the undisputed facts of this action, Purina comes within the provisions of the Poultry Producers Financial Protection Act of 1987, amending the Packers and Stockyards Act of 1921 (hereinafter referred to as the Act), 7 U.S.C. §§ 182, 197, such that it is entitled to the statutory trust, i.e., whether Purina was a "poultry grower" and whether its contractual arrangement with Roxford was a "poultry growing arrangement".

Resolution of some of these issues will involve the statutory construction of terms used in the Act. The construction of these particular terms present issues of first impression.

The operative statutory provisions at issue in this litigation are set forth in 7 U.S.C. § 197(a) & (b):

**(a) Protection of public interest from inadequate financing arrangements**

It is hereby found that a burden on and obstruction to commerce in poultry is caused by financing arrangements under which live poultry dealers encumber, give lenders security interest in, or place liens on, poultry obtained by such persons by purchase in cash sales or by poultry growing arrangements, or on inventories of or receivables or proceeds from such poultry or poultry products therefrom, when payment is not made for the poultry and that such financing arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in poultry and protect the public interest.

**(b) Poultry, inventories, receivables and proceeds held by dealer in trust for benefit of unpaid cash sellers or poultry growers**

All poultry obtained by a live poultry dealer, by purchase in cash sales or by poultry growing arrangement, and all inventories of, or receivables or proceeds from such poultry or poultry products derived therefrom, shall be held by such live poultry dealer in trust for the benefit of of all unpaid cash sellers or poultry growers of such poultry, until full payment has been received by such unpaid cash sellers or poultry growers, unless such live poultry dealer does not have an average annual sales of live poultry, or average annual value of live poultry obtained by purchase or by poultry growing arrangement, in excess of $100,000.[1]

> . . . . .

**(e) Definition of cash sale**

For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

7 U.S.C. § 182 sets forth definitions of various of the statutory terms relevant to the resolution of the motions before the court:

> (7) The term 'poultry product' means any product or byproduct of the business of slaughtering poultry and processing poultry after slaughter;
>
> (8) The term 'poultry grower' means any person engaged in the business of raising and caring for live poultry for slaughter by another, whether the poultry is owned by such person or by another, but not an employee of the owner of such poultry;
>
> (9) The term 'poultry growing arrangement' means any growout contract, marketing agreement, or other arrangement under which a poultry grower raises and cares for live poultry for delivery, in accord with another's instructions, for slaughter;
>
> (10) The term 'live poultry dealer' means any person engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another. . . .

1. Poultry Grower.

a. *Standards Governing Statutory Construction.*

"In construing a statute in a case of first impression, [courts] look to the traditional signposts of statutory construction: first, the language of the statute itself . . .; second, its legislative history . . ., and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency." *Brock v. Writers Guild of America West, Inc.,* 762 F.2d 1349, 1353 (9th Cir.1985).

■ Thus, the plain meaning of a statute is the starting point for its interpretation. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). "If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If, however, the plain language of the statute does not lend itself to clear interpretation, the court then examines relevant legislative history to determine Congressional intent, *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), looking, as noted, to the interpretation given to a statute by its administering agency as an aid in interpreting Congressional intent. *Brock, supra.* Moreover, because the Act is remedial legislation, it is intended to be construed liberally to effect its purpose. *In re*

---

**1.** It is undisputed that the statutory minimum amount was exceeded in connection with this matter.

*G & L Packing Co., Inc.*, 20 B.R. 789, 808 (Bkrtcy.N.D.N.Y.1982), *aff'd*, 41 B.R. 903 (N.D.N.Y.1984); *Pennsylvania Agr. Co-op. v. Ezra Martin Co.*, 495 F.Supp. 565, 570 (M.D.Pa.1980).

### i. Plain Meaning.

Purina argues that it is a "poultry grower" "engaged in the business of raising and caring for live poultry for slaughter by another" within the plain meaning of Section 182(8). The phrase "engaged in the business of raising and caring" are not defined in the statute.

Purina bases its assertion on the fact that it owned the turkey poults and retained title to the turkeys at all times until they were sold to Roxford for slaughter,[2] that it contracted with growers to provide the grow-out services, that it retained the authority to approve any prescribed management program recommended by Roxford to the growers, that Roxford, as flock supervisor, provided Purina with weekly field inspection reports informing Purina as to the health and condition of the turkeys, which field inspection reports were reviewed by Purina's in-house poultry experts.

Norbest points out that Webster's New Collegiate Dictionary (1980) defines "raise" in relation to animals as "to breed and bring (an animal) to maturity" and defines "care" to mean "painstaking and watchful attention". Norbest contends that the plain meaning of these terms requires that to be a poultry grower within the meaning of the statute there must be "direct, hands-on involvement in the actual growing, treating, feeding, and husbandry of the poultry to the point of slaughter".

■ The court does not agree with either party that the meaning of these terms is so plain that resort to the legislative history is not required. In the court's opinion, Norbest's position ignores the "engaged in the business" portion of the phrase. A statute should be construed so as to avoid making any word superfluous. *United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir.1985). "In construing a statute, it is the duty of the court to give significance to every word, phrase, sentence and part of an act as a whole, and not to render it partially or entirely void." *Matter of Borba*, 736 F.2d 1317, 1320 (9th Cir.1984). However, the court also is persuaded that the scope of "engaged in the business" is ambiguous. Therefore, the court will look to legislative history in construing this portion of the Act.

### ii. Legislative History.

■ Norbest argues that the legislative history makes clear that Congress intended to protect the growers who actually do the work in raising and caring for live poultry.

The court does not agree. The legislative history of the Poultry Producers Financial Protection Act of 1987 is reprinted in 1987 U.S.C.C.A.N. 855–865. Nothing in House Report No. 397 indicates Congressional intent as argued by Norbest. In fact, the House Report indicates that Purina's position is the correct one, i.e., that a poultry grower can include the owner of live poultry who contracts the grow-out to a third party.

Norbest further refers the court to the debates in the House on the 1987 Amendments to the Act. Norbest contends that these debates "further reflect concern for individual hands-on growers facing financial ruin in the event of financial failure of processors *or* integrators." 113 Cong.Rec. H9002–9004. Norbest also refers the court to testimony from farmers in 1984 during

---

**2.** Norbest moves to strike that portion of the Declaration of Mark Lakers, Director of Financial Services, National Region, for Purina from January 1989 to August 1990, wherein Lakers avers that Purina "purchased turkey poults from suppliers...." on the ground that it is made without personal knowledge and is conclusory. The court is reminded of the objections made by Roxford's attorneys in the proceedings in connection with the writ of attachment. Mr. Lakers avers that he has "personal knowledge of the matters stated herein, or knowledge based upon records in my custody and control, which records were made or obtained by Purina ... in the regular course of Purina's business, at or near the time mentioned." Given the absence of some factual showing by Norbest that Purina did not purchase or own the poults, the court sees no legitimate reason to disregard this averment.

hearings whereby Congress examined whether prompt payment and statutory trust protections similar to those accorded livestock producers and sellers in the 1976 amendments to the Packers and Stockyards Act of 1921. *Hearing Before the Subcommittee on Agricultural Production, Marketing and Stabilization of Prices of the Committee on Agriculture, Nutrition and Forestry on S. 2781*, 98th Cong., 2d Sess. 21 (1984). In addition, Norbest refers the court to a number of statements pertaining to family farmers, farmers, small family livestock producers, etc. by Representatives and Senators during the debate concerning the 1976 amendments which added prompt payment and statutory trust provisions for sellers of livestock.

Norbest relies on all of this to argue that "[t]he history of the 1987 amendment particularly shows Congress' intent to protect actual growers and poultry farmers from financial failures of both processors *and* payors under growout contracts, a status Purina is asserting in the present case. The statutory trust provision is explicitly limited by its plain terms to poultry growers and cash sellers, not all participants in a 'poultry growing arrangement.' If Congress had intended as much, the language could have easily so stated."

The court simply does not agree with Norbest's construction of the statute that the term "poultry grower" means only the actual hands-on grower and excludes everyone else who owns poultry and contracts with another to provide grow-out services. Nothing in the legislative history that supports its construction. The fact that concern was expressed for the family farmer and the small, independent operator does not imply a limitation of the statutory provisions to them, especially when no definition of such is provided in the statute. Moreover, such a construction would make meaningless the term "poultry growing arrangement" used in the statute.

### iii. Agency Interpretation.

The court notes that the determination of Congressional intent set forth above is consistent with the construction given the contested portion of the Act by the Packers and Stockyards Administration in connection with this dispute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra*, 467 U.S. at 843–845, 104 S.Ct. at 2781–83.

There is an issue in this case concerning the scope of agency authority in connection with the enforcement of the statutory trust provisions and the deference to be accorded the the PSA.

In 7 U.S.C. § 228(a) & (b) it is provided in pertinent part:

> (a) The Secretary [of Agriculture] may make such rules, regulations, and orders as may be necessary to carry out the provisions of this chapter. . . .
> (b) The Secretary shall maintain within the Department of Agriculture a separate enforcement unit to administer and enforce subchapter II of this chapter.

Purina relies on these provisions in contending that Congress specifically mandated that the U.S.D.A. establish a separate administration and enforcement unit to administer and enforce the statutory trust provision at issue in this action.

Section 197 is included within Subchapter II. The Packers and Stockyard Administration (hereinafter referred to as PSA) is empowered to "carr[y] out the enforcement of the provisions of the Packers and Stockyards Act relating to packers and live poultry dealers and handlers." 9 C.F.R. § 204.-2(c). In this regard, PSA's responsibilities and functions include "[d]etermination of applicability of the provisions of the Act to individual packer and poultry operations; investigation of complaints; initiation of formal proceedings, when warranted, to correct illegal practices; and maintenance of working relationships with the meat packer and poultry industries." *Id.* Finally, Section 210(c) provides:

> The Secretary may at any time institute an inquiry on his own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made to or before the Secretary, by any provision of this subchapter, or concerning which any question may arise under any of the provisions of this subchapter,

or relating to the enforcement of any provisions of this subchapter. The Secretary shall have the same power and authority to proceed with any inquiry instituted upon his own motion as though he had been appealed to by petition, including the power to make and enforce any order or orders in the case or relating to the matter or thing concerning which the inquiry is had, except orders for the payment of money.

Norbest refers the court to the deposition testimony of Kenneth Stricklin, Director of the Packer and Poultry Division of the U.S.D.A. since 1982, of Teresa Toups, Regional Supervisor and field investigator for the PSA in connection with this matter, of of Peter Train, attorney with the Office of the General Counsel for the U.S.D.A., and of Fred Bridgman, acting Financial Chief for PSA to the effect that the PSA is not the final determiner of the validity of a claim to entitlement to the statutory trust, that the PSA does not enforce claims to entitlement to the statutory trust, and that the PSA investigates and makes recommendations to the trustee who, along with the courts, if necessary, will make the final decision. *See* 7 U.S.C. § 209.

Norbest relies on this deposition testimony as establishing that the determinations of the PSA are entitled to no deference by this court in construing the statutory provisions at issue. In so arguing, Norbest refers the court to *Todd v. Shipyards Corp. v. Black*, 717 F.2d 1280, 1284 (9th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984), wherein the Ninth Circuit joined numerous cases including the United States Supreme Court in holding that the Benefits Review Board is not a policymaking agency and, thus, its interpretations of the Longshoremen's and Harbor Workers' Compensation Act are entitled to no special deference. Because the PSA does not enforce the statutory trust provisions and does not make a final determination of entitlement to the trust provisions, Norbest argues that the PSA's determinations are irrelevant to the statutory construction issues involved in this action.

Norbest's contention is unpersuasive. There is a substantial difference between a body hearing administrative appeals and a body conducting administration, including investigation. Moreover, in *Wilshire Westwood Associates v. Atlantic Richfield*, 881 F.2d 801, 810 (9th Cir.1989), deference was accorded interpretations by the EPA of the scope of the petroleum exclusion under CERCLA even though the Ninth Circuit noted that a party's right to advance a private right of action for damages under CERCLA is not dependent upon a previously governmentally authorized cleanup program. And in *Rembold v. Pacific First Federal Savings Bank*, 798 F.2d 1307, 1311 (9th Cir.1986), deference was accorded an SEC interpretation of the scope of the National Housing Act in a matter not involving any question of enforcement authority by the SEC.

Also unpersuasive is Norbest's assertion that that little, if any, deference should be accorded the decisions of the PSA in this matter because they were made in an uncontested, non-adversary proceeding. First of all, the decision upon which Norbest relies as support for this contention, *Case & Co., Inc. v. Board of Trade of City of Chicago*, 523 F.2d 355, 361 (7th Cir.1975), does not hold that a contested, adversarial arena is necessary in order for an agency interpretation to be accorded deference by a court in construing the meaning of a statute. Moreover, as noted above, the PSA's interpretation is consistent with that already determined to be correct by this court.

Equally unavailing is Norbest's argument that the court should not accord deference to the documents set forth above because PSA's opinion is not long-standing and consistent. However, because the Act was amended in 1987, it is impossible that there be a long-standing interpretation. While this fact certainly militates against deference to the PSA interpretation as does the fact that the PSA essentially based its decision solely on evidence, so to speak, provided by Purina in accordance with investigatory guidelines developed by the PSA, the court does not conclude that the court's determination of Congressional in-

tent is therefore erroneous. The court views the PSA's position as entitled to weight and consideration although it does not consider the PSA's position to be conclusive. Moreover, the court views PSA's position to be a pendent to the court's construction of the legislative history.

### b. *Raise and Care For.*

Norbest further argues that Purina is not entitled to summary judgment because Purina personnel did virtually *nothing* in connection with the raising and caring for the turkeys, relying instead on Roxford personnel and the growers. It appears the Purina's only real activity in connection with the growing of these turkeys was the review by Purina personnel in St. Louis of the weekly field inspection reports filled out by Roxford personnel. Norbest further contends that Purina's assertion of title to the turkeys does not establish that Purina was "engaged in the business of raising and caring for live poultry for slaughter by another, whether the poultry is owned by such person or another...."

The court simply does not agree with Norbest on this issue. The court concurs with Purina that the fact that it chose to conduct its business through contracts with growers and flock supervisors does not negate that it was "engaged in the business of raising and caring for live poultry...." Moreover, an examination of the definition of "poultry growing arrangement" in Section § 182(9) confirms Purina's reading of the statute. Norbest's position would read "marketing agreement, or other arrangement ..." out of the statute and limit a "poultry grower" to only those with "grow-out contracts".

### 2. Poultry Growing Arrangement.

#### a. *Financing Agreement.*

■ Both Norbest and Louis Rich argue that Purina's motion for summary judgment should be denied because the Purina–Roxford contractual relationship was not a "poultry growing arrangement" as that term is used in the statute but, rather, a financing arrangement excluded from the Act's protection.

In so arguing, these parties refer the court to the statement of statutory purpose set forth in Section 197(a):

#### (a) Protection of public interest from inadequate financing arrangements

It is hereby found that a burden on and obstruction to commerce in poultry is caused by financing arrangements under which live poultry dealers encumber, give lenders security interest in, or place liens on, poultry obtained by such persons by purchase in cash sales or by poultry growing arrangements, or on inventories of or receivables or proceeds from such poultry or poultry products therefrom, when payment is not made for the poultry and that such financing arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in poultry and protect the public interest.

This provision establishes Congress' intent that secured financers not be allowed to have priority over cash sellers or poultry growers providing poultry for slaughter to the live poultry grower in the case of the bankruptcy of the live poultry grower.

Norbest and Rich argue that the contractual arrangement between Purina and Roxford allowed Roxford to finance the birds and Purina to be in an even better position than that of the secured lenders against whom Congress wished to protect cash sellers and poultry growers. Louis Rich further argues:

Purina bore none of the market and production risks that a typical poultry grower would bear. Purina 'stood no losses' for the costs incurred with respect to the raising of each flock ... from egg to processing plant. The only risk it bore was a credit risk—the sort of risk a financer typically bears. As the icing on the cake, Purina then can claim that it is entitled to trust benefits under the Act and step in front of people who are truly so entitled.

In responding that the contractual relationship between itself and Roxford was not a disguised financing arrangement, Purina points out that there are no documents

establishing any kind of lender/borrower relationship such as UCC–1's, security agreements, or promissory notes. Purina further points out that the two flocks raised on the Alameda Ranch were owned by Roxford and financed by Purina. With respect to these two flocks the parties executed promissory notes, security agreements and UCC–1's. In connection with these two flocks Purina was compensated for the use of its funds by a surcharge on the price of feed that Purina supplied for the birds in addition to the amount advanced for the cost of the milling of the feed. Purina relies on these facts as negative evidence that the contractual arrangement at issue was not a financing arrangement. Purina further argues:

> The financing argument relies upon the 'cost plus' nature of the agreement. The theory is that Purina ... did not bear the risk of ownership of the birds because Roxford was obligated to pay the costs of raising them. That theory would turn every 'cost plus' contract into a financing arrangement ... Obviously that is not the law. Nothing precludes an owner to based its price for selling turkeys upon the cost of raising them, plus an additional amount for profit....
>
> However, Louis Rich and Norbest point to the language in the [TMMA that "Roxford will pay Purina $.0175 per lb of net live weight for financing and profit (profit incentive)"]. However, they ignore Mr. Rittenhouse's testimony about the $.0175 per net live pound payment, which makes clear that the reference to 'financing' is because one of the costs that was factored into the price charged Roxford for the birds was Purina Mills cost of funds....
>
> Does the one and three quarter cents per pound 'profit incentive' include interest? Certainly not. Interest is 'money paid for the use of money' and 'an increase or addition over what is owed' ... There was no use of money here. Purina ... did not give Roxford any money in ex-

change for the payment of an addition over what it was owed.

> What Roxford owed Purina ..., the price of the turkeys was calculated based upon the agreed costs of raising the birds plus a fixed amount tied to the live weight of birds actually delivered to Roxford. The 'profit incentive' was, therefore, not tied to the amount of money Purina Mills expended for the raising of the birds. The amount of 'profit incentive' bore no relationship to the amount of money involved and cannot be considered a fee for the use of funds. Because the amount owed included the 'profit incentive,' Roxford did not pay any amount over what was owed. Accordingly, the 'profit incentive' was not an interest payment.

The court is persuaded that the absence of any security or security documents belies a finding of a financing arrangement. Moreover, it must be noted that Purina has paid all of the "growers" with which it contracted for growout of the turkeys transferred to or to be transferred to Roxford for processing. This, in conjunction with the absence of security, negates Norbest and Louis Rich's arguments that Purina is somehow violating the purposes of the 1987 amendments to the Act.

Moreover, *In re Frosty Morn Meats, Inc.*, 7 B.R. 988, 1018–1022 (M.D.Tenn. 1980) provides authority by analogy that Purina should not be excluded from the protection of the statutory trust provisions given the fact that it has paid its growers. *In re Frosty Morn Meats* holds that "middlemen" as defined by statute are included within the definition of cash sellers of livestock entitled to the protection of the livestock statutory trust provisions. As in *Frosty Morn*, Purina actually made these payments and is completely unprotected. While *Frosty Morn* is not controlling on this issue, the concern expressed by the district court that the remedial purpose of the statute would be defeated by a narrow construction of the Act is also applicable here.[3]

---

**3.** Norbest argues that *Frosty Morn* is irrelevant to the issues before the court because Purina was not a "cash seller", *see* discussion *infra,* and

the livestock trust provisions do not contain an analogous "livestock growing arrangement". Norbest's point is that its one thing to equate a

### b. *Joint Venture.*

Norbest further moves for summary judgment that the contractual arrangement between Purina and Roxford was not a poultry growing arrangement but, rather, a joint venture in which Purina provided capital and Roxford provided services.

However, Norbest has not demonstrated that such a joint venture cannot be a poultry growing arrangement. Thus, even were the court to agree that there were no genuine issues of fact concerning the asserted joint venture status of the contractual arrangement between Purina and Roxford,[4] the relevance or materiality of these facts has not been shown.

### 3. Cash Seller.

Norbest moves for summary judgment that Purina did not make "cash sales" within the meaning of the meaning of Section 197(e).

Norbest make this argument in its motion because of allegations in Purina's complaint that it is entitled to the statutory trust because of cash sales. However, in its response to this portion of Norbest's motion, Purina asserts that it made no cash sales but, rather, made sales pursuant to the poultry growing arrangement. Consequently, the court concludes that it is unnecessary to resolve this issue and declines to do so.

### 4. Live Poultry Dealer.

#### a. *Purina.*

■ Norbest further argues that Purina was a "live poultry dealer" as that term is defined in Section 182(10), i.e., "any person engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." In so arguing, Norbest asserts that, pursuant to the contracts at issue, Purina was engaged in the business of obtaining live poultry from the

growers it contracted with for the purpose of selling it to Roxford, another live poultry dealer, for slaughter. Therefore, Norbest argues, Purina is not entitled to invoke the Act's statutory trust provisions.

However, as Purina responds, nothing in the Act precludes a "poultry grower" from also being a "live poultry dealer". In addition, Purina was not a "live poultry dealer" because it owned the birds until they were delivered to Roxford for slaughter.

#### b. *Norbest.*

■ In its counter-motion Norbest moves the court for summary judgment that it is not a "live poultry dealer" within the meaning of Section 197(b):

**(b) Poultry, inventories, receivables and proceeds held by dealer in trust for benefit of unpaid cash sellers or poultry growers**

All poultry obtained by a live poultry dealer, by purchase in cash sales or by poultry growing arrangement, and all inventories of, or receivables or proceeds from such poultry or poultry products derived therefrom, shall be held by such live poultry dealer in trust for the benefit of of all unpaid cash sellers or poultry growers of such poultry, until full payment has been received by such unpaid cash sellers or poultry growers....

The purpose of seeking this ruling is that the court also will rule that the funds currently being held by Norbest in trust as proceeds from the sales of processed turkey product produced by Roxford are not subject to the statutory trust provisions with regard to Purina claim or the claim of any other party to this action.

However, as contended by Purina and Louis Rich, whether or not Norbest is a "live poultry dealer" is irrelevant for the purposes of this litigation. Norbest has admitted in its Answer of Norbest, Inc. to First Amended Counter and Third Party Claims of Purina Mills, Inc. "that it entered

---

middleman to a cash seller, but it's another to equate an entity such as Purina who did virtually no growout functions to a cash seller or a "poultry grower." However, in the court's opinion, Norbest is missing Purina's point, i.e., that

it is completely unprotected in these transactions.

**4.** Issues with respect to which the court expresses no opinion.

into an agreement with [Roxford's poultry suppliers] pursuant to which Norbest was authorized to take possession of and proceed with sales of turkey inventory. Norbest further admits that proceeds of the sales have been placed into a trust account of its counsel." Because Norbest holds these funds as a trustee, its status as a live poultry dealer is irrelevant. Moreover, as argued by Louis Rich, Norbest has confused the issue of who is the statutory trustee with that of what constitutes the corpus of the trust. In *In re G & L Packing Co., Inc.,* 41 B.R. 903, 915 (N.D.N.Y.1984), *quoting In re Gotham Provision Co., Inc.,* 1 B.R. 255, 261 (S.D.Fla.1979), *aff'd* 669 F.2d 1000, 1008–1012 (5th Cir.1982), the district court interpreted the livestock statutory trust provisions which hold that "proceeds for livestock sales which are collected by a packer's creditor and applied against the principal amount of the packer's debt are considered part of that 'floating pool' and are subject to recovery by the livestock seller." Because the operative provision of the livestock trust provision is virtually identical to that of the poultry trust provision,[5] these cases control resolution of this issue.

### C. *U.S.D.A. Motion for Leave to File Amicus Brief.*

 The U.S.D.A. seeks leave to file an amicus brief in this action.

As explained in *United States v. Louisiana,* 751 F.Supp. 608, 620 (E.D.La.1990):

> The privilege of being heard amicus rests solely within the discretion of the court ... Generally, courts have exercised great liberality in permitting an amicus curiae to file a brief in a pending case, and, with further permission of the court, to argue the case and introduce evidence ... There are no strict prerequisites that must be established prior to

qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court.

Here, the reasons the U.S.D.A. seeks to file its amicus brief are persuasive. The U.S.D.A. has general oversight authority over the Act and is empowered to bring administrative actions against those who violate the Act and, in fact, prosecuted Roxford and Tutelian for violations of the Act after conducting the investigation discussed above. Moreover, this is the first major contested case involving the 1987 amendments to the Act. Finally, given Norbest's lengthy attacks on the PSA's actions, policies, and officials, the U.S.D.A. should be given the opportunity to address some of these issues itself.

Consequently, the court grants the U.S.D.A.'s Motion for Leave to File Amicus Brief.

### D. *Application of Rulings to Poultry Transport Systems, Inc. and Poultry Transport Service, Inc.*

At oral argument, counsel for Poultry Transport Systems, Inc. and Poultry Transport Service, Inc. implied that because neither entity was a party to *Purina Mills, Inc. v. Roxford Foods, Inc.,* No. CV–F–89–846 REC, neither would be bound by any of the court's rulings herein.

These entities are the respective plaintiffs in Nos. CV–F–91–009 REC and CV–F–91–010 REC. Purina has raised the identical issues in those cases as are being considered by the court in No. CV–F–89–846 REC. The motions at issue herein were filed in all three cases. Consequently, the position asserted by Poultry Transport Systems, Inc. and Poultry Transport Service, Inc., although technically correct, is meaningless in actual application.[6]

---

**5.** 7 U.S.C. § 196(b), the livestock trust provision, states in pertinent part:

All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until

full payment has been received by such unpaid sellers....

**6.** Because of this, it is not necessary for the court to consider Purina's arguments presented in its second supplemental memorandum that the automatic stay provisions do not apply to

ACCORDINGLY, IT IS ORDERED THAT Purina Mills, Inc.'s Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED that Norbest, Inc.'s Counter–Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that Norbest, Inc's Motion to Strike Evidence is denied.

IT IS FURTHER ORDERED that the United States Department of Agriculture's Motion for Leave to File Amicus Brief is granted.

this action or to the issues being considered by these motions.