**OVERTON POWER DISTRICT NO. 5 and Valley Electric Association, Inc., Plaintiffs,**

v.

**James D. WATKINS, solely in his capacity as the Secretary of the United States Department of Energy; Linda G. Stuntz, solely in her capacity as the Deputy Secretary of the United States Department of Energy; J. Michael Davis, solely in his capacity as the Assistant Secretary for Conservation and Renewable Energy of the United States Department of Energy; and Federal Energy Regulatory Commission, Defendants.**

**No. CV–S–92–860–PMP (RLH).**

United States District Court, D. Nevada.

July 28, 1993.

Melvin D. Close, Jones, Jones, Close & Brown, Las Vegas, NV, James T. McManus, Arnold B. Podgorsky, Wright & Talisman, Washington, DC, for plaintiffs.

C. Max Vassanelli, Dept. of Justice, Civ. Div., Washington, DC, for defendants.

Robert S. Lynch, Phoenix, AZ, Michael R. Pontoni, Las Vegas, NV, for amici curiae Arizona Customer Group.

James P. Bartlett, Phoenix, AZ, Michael N. McCarty, Ritts, Brickfield & Kaufman, Washington, DC, James V. Lavelle, III, Crockett & Meyers, Ltd., Las Vegas, NV, for intervenor Arizona Power Authority.

David W. Hagen, Guild & Hagen, Ltd., Reno, NV, for amici curiae, Dept. of Water and Power of the City of Los Angeles, Southern California Edison Co., and Metropolitan Water Dist. of Southern California.

James K. Hahn, City Atty., Edward C. Farrell, Chief Asst. City Atty. for Water and Power, Los Angeles, CA, Northcutt Ely, Redlands, CA, for amici curiae, Dept. of Water and Power of the City of Los Angeles.

Bryant C. Danner, Ann Cohn, Rosemead, CA, Northcutt Ely, Redlands, CA, for amici curiae, Southern California Edison Co.

Karen L. Tachiki, Asst. Gen. Counsel, Diana Mahmud, Deputy Gen. Counsel, Los Angeles, CA, for amici curiae, Metropolitan Water Dist. of Southern California.

## MEMORANDUM DECISION AND ORDER

PRO, District Judge.

### I. INTRODUCTION

Plaintiffs Overton Power District No. 5 and Valley Electric Association, Inc. (referred to collectively as "Plaintiffs" or "Overton/Valley"), are resale power customers of the Colorado River Commission. On October 15, 1992, Overton/Valley brought this action under the Administrative Procedure Act, 5 U.S.C. § 551, et seq., and the Boulder Canyon Project Act, 43 U.S.C. § 617, et seq., for review of a final Order of the Federal Energy Regulatory Commission ("FERC"), which confirmed a rate charged for power produced at Hoover Dam by the Department of Energy, Western Area Power Administration. *See* United States Department of Energy Rate Order No. WAPA–49, 46 Fed.Reg. 28881 (June 25, 1991). Western, a Power Marketing Administration within the Department of Energy, established the WAPA–49 rate for power sold from the Boulder Canyon Project. The WAPA–49 rate was approved by the Federal Energy Regulatory Commission, which is responsible for reviewing such power rates to determine their lawfulness. The rate is designed to recover the costs of generating power at the Hoover Dam. In its Complaint, Plaintiff Overton/Valley claims the WAPA–49 rate is excessive and seeks an Order of this Court declaring WAPA–49 arbitrary, capricious and an abuse of discretion and otherwise not in accordance with law. Plaintiffs seek an Order precluding Western

from placing any new rates into effect until after it proposes and the Federal Energy Regulatory Commission approves the substitute rate for WAPA–49.

Currently before the Court for consideration are a variety of motions filed by parties to this action and other interested entities.

On December 22, 1992, Defendants James Watkins, Linda Stuntz, J. Michael Davis and FERC, hereinafter referred to as "Defendants", filed a Motion to Dismiss or in the alternative a Motion for Summary Judgment (# 44). Plaintiffs filed an Opposition (# 49) on January 6, 1993. Plaintiffs also filed a Motion to Strike declarations submitted in support of Defendants' Motion to Dismiss (# 48) on January 6, 1993. Defendants filed an Opposition to this Motion to Strike (# 54) on January 21, 1993, and Plaintiffs filed a Reply (# 61) on February 3, 1993. Defendants filed their Reply (# 55) to Plaintiff's Opposition to Defendants' Motion to Dismiss on January 21, 1993. Plaintiffs filed a Motion for Authorization to File a Surrebuttal to Defendants' Reply (# 63) on February 9, 1993. Intervenor Arizona Power Authority filed its Response to Defendants' Motion to Dismiss (# 50) on January 8, 1993.[1]

Plaintiffs filed a Cross–Motion for Summary Judgment (# 46) on December 24, 1992. Defendants filed an Opposition to this motion (# 51) on January 8, 1993, and Plaintiffs filed their Reply (# 56) on January 25, 1993. Plaintiffs filed a Motion requesting oral argument (# 58) on January 27, 1993.

On February 2, 1993, the Department of Water and Power of the City of Los Angeles, Southern California Edison Company, and the Metropolitan Water District of Southern California ("California Group") filed a Motion for Leave to file an Amicus Curiae brief (# 60). Plaintiffs filed an Opposition (# 64) on February 12, 1993. On March 2, 1993,

the Arizona Customer Group[2] filed a Motion for Leave to file an Amicus Curiae brief (# 79). No opposition has been filed.

Finally, Defendants filed a Motion to Bifurcate their Motion to Dismiss and Motion for Summary Judgment (# 53) on January 21, 1993. Plaintiffs filed an Opposition (# 59) January 27, 1993, and Defendants filed a Reply (# 63) on February 8, 1993. This Court held a hearing on the various Motions on July 16, 1993.

## II. PRELIMINARY MOTIONS

### A. The Briefs Filed Amicus Curiae (## 60 & 79)

■ "The privilege of being heard amicus rests solely within the discretion of the Court." *In re: Roxford Foods Litigation,* 790 F.Supp. 987, 997 (E.D.Ca.1991) (internal citations omitted). Although there are no prerequisites that must be met before qualifying for amicus status, *see id.,* historically, an amicus curiae is impartial and gives information about and an interpretation of the law. *See Time Oil Co. v. Cigna Property & Cas. Ins. Co.,* 1990 U.S. Dist. LEXIS 15146 at \*4 (W.D.Wash. April 2, 1990) (citing *Leigh v. Engle,* 535 F.Supp. 418, 420 (N.D.Ill.1982)).

■ The Amicus Brief (# 60) filed by the California Group contains no citation to legal authority whatsoever. Furthermore, as Plaintiffs argue in their Opposition, the Amicus Brief merely restates arguments already posited by Defendants. Thus, the California Group's Motion for Leave to File a Brief Amicus Curiae (# 60) is denied.

■ A review of the amicus brief filed by the Arizona Power Group (# 79), however, urges another approach to the standing issue raised by the Defendants and considered by this Court *infra.* The brief contains many citations to legal authorities, and appears to

1. Arizona Power Authority filed a Motion to Intervene as a Defendant (# 17), and this Court granted the Motion in an Order (# 41) dated November 30, 1992. Arizona Power Authority's Response to Defendants' Motion to Dismiss (# 50) also contained its response to Plaintiffs' Cross–Motion for Summary Judgment (# 46).

2. This group consists of: Aguila Irrigation District, Ak–Chin Indian Community, Buckeye Irri-

gation District, Electrical Districts Nos. 3, 4, 5, 7, and 8, Harquahala Valley Power District, Maricopa Water District, McMullen Valley Water Conservation and Drainage District, Ocotillo Water Conservation District, Roosevelt Irrigation District, Salt River Project Agricultural Improvement and Power District, Tonopah Irrigation District, and Wellton–Mohawk Irrigation and Drainage District.

be of help to this Court in reaching a just determination of the issues. Furthermore, this Court notes that no opposition to the Arizona Power Group's Motion (# 79) has been filed. Therefore, Arizona Power Group's Motion to File a Brief Amicus Curiae (# 79) is granted.

### B. Motion To Bifurcate (# 53)

At the hearing conducted July 16, 1993, the Court denied Defendants' Motion to Bifurcate (# 53).

### C. Motion To Strike Defendants' Declarations (# 48)

Defendants have submitted six declarations in support of their Motion to Dismiss/Motion for Summary Judgment. They have also submitted two declarations in support of their Motion in Opposition to Plaintiffs' Motion to Dismiss. These declarations are sworn statements by various officials of the Western Area Power Administration ("Western") and the Bureau of Reclamation ("Reclamation").[3] Plaintiffs ask this Court to strike the declarations, because they assert that in reviewing the agency action at issue in this case, this Court is confined to the administrative record, and that it would be improper for this Court to consider post-hoc rationalizations of agency officials.

■ Generally, review of an administrative agency's action should be confined to the administrative record. *See, e.g., AT & T Information Systems v. General Services Administration*, 810 F.2d 1233, 1236 (DC Cir.1987). A court may, however, consider information outside the record, but only for "the limited purpose of background information or to determine whether the agency considered all of the relevant factors." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir.1989). "The administrative record consists of all documents and materials directly or indirectly considered by agency decisionmakers ..." *Id.* A court may also go outside the administrative record where it is necessary to aid in the Court's understanding of technical or complex sub-

ject matter. *See Franklin Savings Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) (citing *Animal Defense Council v. Hodel*, 867 F.2d 1244 (9th Cir. 1989) and *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988)).

■ This Court relies on the submitted declarations inasmuch as they provide background explanation for the complex aspects of this case. This Court also relies upon the declaration of David G. Shelton, for the proposition that in calculating the WAPA–49 rate, Western did not take into account any deferral of Uprating Credits. See Part V, Section C, *infra.* The determination of whether the calculation of WAPA–49 took such deferrals into account is an extremely complex task, and although this Court found nothing in the administrative record to indicate that WAPA–49 had in fact considered deferral of Uprating Credits, this Court notes that Shelton's explanation confirms this finding, and as such, relies on Shelton's declaration as an additional source of explanation. This is not a "post-hoc" rationalization of agency action, but rather evidence of the relevant factors considered and not considered by Western. *See AT & T Information Systems, Inc.*, 810 F.2d at 1233 (new material may be considered if it is explanatory of the original record and contains no new rationalizations).

### III. STANDARDS

### A. Motion To Dismiss

■■ In considering Defendants' Motion to Dismiss, the factual allegations of Plaintiffs' Complaint must be presumed to be true, and this Court must draw all reasonable inferences in favor of Plaintiffs. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). The issue is not whether Plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Consequently, the Court may not

---

**3.** See Part IV, Section A, *infra,* for a description of the various entities, including Western and

Reclamation, involved in this action.

grant a Motion to Dismiss for failure to state a claim "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957). The Court does not, however, necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in Plaintiffs' Complaint. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

### B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270 (9th Cir. 1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

*See also Avia Group Int'l, Inc. v. L.A. Gear Cal.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

## IV. PROCEDURAL BACKGROUND

### A. The Parties

Plaintiffs, Overton and Valley, are resellers of electric power generated at the Hoover Dam by the Boulder Canyon Project ("BCP"). Overton and Valley are recipients of an allocation from the State, of Nevada of electric power produced by the BCP. Overton and Valley do not purchase power directly from BCP. The Colorado River Commission ("CRC") is one of several entities which the Hoover Dam Act authorizes to enter into contracts for the purchase of BCP power directly. These entities are sometimes referred to as BCP Contractors.[4] The CRC, in turn, sells the power it buys to Overton and Valley, among others. The CRC is the only Nevada entity licensed to purchase power directly from the BCP; any Nevada entity wanting to purchase BCP power must do so through the CRC. *See* 43 U.S.C. § 619a(a)(1)(B). The rates paid by Overton/Valley to the CRC for BCP power are exactly the same as the rates that the BCP charges the CRC itself; the CRC is merely a conduit through which other entities may purchase electrical power produced at the Dam. See Contract between Overton/Valley and CRC at ¶ 9.1, Exhibit 10, Defendants'

Response to Plaintiffs' Motion for Summary Judgment (# 55).

The rate charged for power generated at the Hoover Dam is set by the Western Area Power Administration ("Western"), a Power Marketing Administration within the United States Department of Energy ("DOE"). Western also administers the purchase of BCP power by the Contractors. The Federal Energy Regulatory Commission ("FERC") is responsible for determining whether the rate proposed by Western complies with the applicable statutes and regulations.[5]

In administering the purchase and sale of BCP power to the Contractors, Western collects payments made by contractors and forwards the revenues to Reclamation, the entity charged with responsibility for the Dam and for its power generating activity. According to Thomas Hine, the area manager for the Phoenix area office of Western, Reclamation then applies the revenues received from Western to Reclamation's expenses, returns part of the monies to Western to permit Western to cover its expenses, and makes payments to the U.S. Treasury.

Overton/Valley filed this action in order to challenge a power rate set by Western, approved on an interim basis by the DOE Deputy Secretary, and confirmed and approved on a final basis by FERC. On October 25, 1990, Western proposed a rate in-

---

**4.** The other Contractors are the Arizona Power Authority; the City of Boulder City, Nevada; The Metropolitan Water District of Southern California; the Department of Water and Power of the City of Los Angeles; the Southern California Edison Company; and the California municipalities of Anaheim, Azusa, Banning, Burbank, Colton, Glendale, Pasadena, Riverside, and Vernon.

**5.** Pursuant to 43 U.S.C. § 618, the Secretary of the Interior is authorized to promulgate charges for electricity produced at Hoover Dam. Under Section 302 of the Department of Energy Organization Act, 91 Stat. 565, P.L. 95–91, 42 U.S.C. § 7152(a)(1), the functions of the Secretary of the Interior with regard to power marketing functions of the Bureau of Reclamation were transferred to the Secretary of the Department of Energy. The Secretary of the Department of Energy, in turn, delegated authority to issue interim approval of rates to the Under Secretary of the Department of Energy. See 51 Fed.Reg. 19744, May 30, 1986 (Amended Delegation Order 0204–108); *see also* 42 U.S.C. § 7252 (stat-

ute permitting Energy Secretary to delegate functions); *United States v. Tex–La Electric Cooperative, Inc.*, 693 F.2d 392 (5th Cir.1982) (detailed discussion of the various statutes and agencies charged with regulating and marketing hydroelectric power). The Energy Secretary also delegated to the Federal Energy Regulatory Commission the exclusive authority to confirm and approve, on a final basis, rates developed by each Power Administration. See Delegation Order, 51 Fed.Reg. 19744. The Delegation Order, however, limits FERC's review of rates to ascertaining (1) whether the rates are the lowest possible to customers consistent with sound business principles, (2) whether the rates generate enough income to pay for the cost of producing and transmitting the power, and (3) whether the assumptions and projections used in developing the rate were sound. The Delegation Order directs FERC to reject rates if they are arbitrary or capricious, or if they violate the standards set forth in DOE Order No. RA 6120.2 (attached as Exhibit F in Defendants' Motion to Dismiss (# 44)).

crease for the sale of BCP power, and initiated a formal public comment process. This rate became known as "WAPA–49." DOE Deputy Secretary W. Henson Moore approved the new rate on an interim basis, permitting Western to implement this rate adjustment effective July 1, 1991.

On June 10, 1991, DOE filed the interim rate with FERC for final approval, and published a notice of this filing in the Federal Register on June 25, 1991.[6] On August 26, 1991, before FERC had approved or disapproved of the interim rate, Western and the Contractors filed a stipulation and petition requesting FERC defer review of the interim rate for one year, until August 26, 1992. The intended purpose of this requested delay was to permit Western and the Contractors to enter into discussions to arrive at a mutually agreeable methodology for determining the rate at which BCP power would be sold. Overton and Valley objected to both the increased rate approved by DOE, and to the requested delay of FERC consideration.

In a Notice dated December 17, 1991, FERC deferred the filing of protests, comments, and motions, and other consideration of the proposed rates until February 28, 1992. On February 28, the Contractors filed a Status Report with FERC, in which they requested continued deferral to allow them to reach an agreement with Western as to new rates. These new rates would effectively supersede WAPA–49. By notice dated March 18, 1992, FERC extended deferral of consideration of WAPA–49 until at least April 30, 1992.

On April 29, 1992, Western and the Contractors filed a joint Status Report with FERC, stating that they had reached an agreement. In this agreement, the Contractors and Western agreed upon a new methodology for calculating power rates. The Contractors agreed to pay the rates stated in WAPA–49 until the rate using the new methodology was put in place, beginning October 1, 1992, or soon thereafter. Finally, it was agreed that neither the Contractors nor Western would initiate further activity regarding WAPA–49, and they requested FERC continue to defer activity on WAPA–49 until the parties could file a Settlement Agreement. On May 27, 1992, the Contractors and Western filed a Second Joint Status Report, in which they informed FERC that they expected to file the Settlement Agreement with FERC on or before June 30, 1992. On September 15, 1992, Western filed with FERC the Settlement Agreement reached between it and the Contractors.[7]

As they had done periodically since WAPA–49 was proposed, Overton/Valley filed a protest with FERC. On October 5, 1992, Overton/Valley protested the Settlement Agreement, claiming that it failed to cure the allegedly defective WAPA–49 rate, and that the Agreement would moot FERC review of this rate. Overton/Valley filed this action on October 15, 1992 to compel FERC to review WAPA–49. On November 10, 1992, FERC issued an order (1) granting Overton/Valley's Motion to Intervene, filed with FERC on September 16, 1991, (2) determining that FERC lacked the statutory authority to approve the Settlement Agreement, and (3) issuing final approval to WAPA–49.

On November 23, 1992, Overton/Valley filed an Amended Complaint in this Court, contending that FERC's Order of November 10, 1992, was a final agency action and thus is reviewable in this Court. Overton/Valley seek to challenge the WAPA–49 rate that it has paid for power generated at the Hoover Dam starting July 1, 1991, and will be forced to continue to pay until such time as the new interim rate is approved by FERC and be-

---

6. See 56 Fed.Reg. 28881 (June 25, 1991).

7. On June 10, 1992, Western proposed another adjustment in power rates. This adjustment became known as WAPA–58. The DOE Deputy Secretary approved the rate increase to become effective January 1, 1993, and filed the adjustment with FERC for its final approval on December 15, 1992. Plaintiffs allege that, pursuant to the terms of the Delegation Order, if FERC acts on WAPA–58 before judicial review of WAPA–49 is completed, FERC's ability to grant a refund for the allegedly excessive WAPA–49 will expire. Plaintiffs and Defendants have previously stipulated, however, that a new BCP interim rate would not deprive this Court of jurisdiction to determine the legality of WAPA–49.

comes effective. This case asks this Court to review FERC's final approval of WAPA–49.

### B. The Settlement Agreement

Western and its Contractors entered into the Settlement Agreement on September 15, 1992. The Agreement incorporated three primary areas of consensus among the parties. First, Western agreed to utilize a new methodology for the determination of BCP power rates, commencing with rates effective October 1, 1992, or soon thereafter. This new methodology was developed by an ad hoc Hoover Power Rates Methodology Committee, consisting of representatives of each Contractor. Second, the Contractors agreed to pay the WAPA–49 rates until rates determined pursuant to the new methodology become effective. Third, Western and the Contractors agreed not to initiate any further activity regarding "Docket EF91–5091–000"[8], and agreed to request that FERC take no further action with regard to WAPA–49, other than to approve and implement the Settlement Agreement.[9]

### C. The Settlement Agreement Does Not Bar Plaintiffs' Action

Defendants argue that the Settlement Agreement's provision in which Western and the Contractors agreed not to further contest WAPA–49 is binding on Overton/Valley. It notes that the Hoover Power Plant Act limits contracts for power in the case of Arizona and Nevada to the Arizona Power Authority and the Colorado River Commission, respectively, and that therefore, Plaintiffs are specifically prohibited from contracting with Western for the purchase of BCP power.

Defendants further contend that under Nevada statutes, the CRC has a broad mandate to "perform any lawful act which is necessary or desirable to carry out" its role as Nevada's representative in the purchase of BCP power. See Defendants' Motion to Dismiss (# 44) at 5 (citing N.R.S. 538.041 et. seq.). Defendants stress that these and other statutorily provided powers enable CRC to act on behalf of its customers, such as Plaintiffs, and to enter into arrangements such as the Settlement Agreement.

Defendants characterize Plaintiffs as "third-party beneficiaries" of the contract between Western and CRC, and argue that third-party beneficiaries are subject to any contract defenses that the parties to the contract would have if those parties were suing on the contract. Therefore, Defendants conclude that as the contract (i.e. the Settlement Agreement) bars CRC from litigating WAPA–49, it likewise bars the Plaintiffs. In short, Defendants contend that CRC is the only entity in Nevada authorized to challenge WAPA–49.

Overton/Valley do not dispute the contention that they are not permitted to contract directly with Western for the purchase of electric power, and that they must obtain their share of BCP power through the CRC. They argue, however, that this fact does not preclude them from litigating final agency action. FERC issued its Order confirming and approving WAPA–49 on a final basis on November 10, 1992, and Overton/Valley contend that the Settlement Agreement does not prohibit them from challenging this action.

■ This Court rejects Defendants' arguments, and finds that Overton/Valley has standing to challenge FERC's confirmation of WAPA–49. First, it is not clear whether the Settlement Agreement should be construed to mean that Western and the Contractors agreed to refrain from litigating issues arising from WAPA–49 in a judicial arena. The Settlement Agreement itself only specified that the parties agreed to not take any further action in Docket EF91–5091–000. This is an agreement to forego any future activity in front of FERC regarding WAPA–49, and does not explicitly prohibit either party from filing a lawsuit. If the parties themselves did not reach an agreement to refrain from litigating, it would be

---

**8.** The Court understands this reference to the Docket to be Western's application for a rate increase, embodied in WAPA–49.

**9.** The Settlement Agreement noted that whether FERC confirmed and approved, rejected and re-

manded, or withheld action on the WAPA–49 rates, the practical outcome would be the same, in that the WAPA–49 rate would remain in place until a new rate schedule was made effective.

illogical to apply this restriction to Overton/Valley.

■ Second, even assuming this Court interpreted the Settlement Agreement as an agreement to refrain from litigating, neither theory advanced by the Defendants to support their argument that the Settlement Agreement binds Overton/Valley is persuasive. Even if Overton/Valley were third party beneficiaries of the Settlement Agreement, this Court knows of no authority under which to hold a third party beneficiary liable on a contract to which it is not a signatory.[10] Further, after a review of the contract between the CRC and Overton, there appears to be no provision that could be interpreted to waive Overton's right to challenge FERC's Order.

■ The authority granted to the CRC under the Nevada statutes does not have the effect of preventing Overton/Valley from challenging FERC's confirmation of WAPA–49. N.R.S. § 538 et. seq. grants the CRC the authority to represent and act for Nevada in the execution of contracts for the use or purchase of power for the greatest possible benefit to the state. The statutes also empower the CRC to cooperate with federal agencies to establish power and water projects, and provide that the CRC holds and administers all rights and benefits pertaining to the distribution of water and power and may lease, contract, or sell power or water on such terms as it determines. The Defendants argue that this statutory scheme empowers the CRC to act on behalf of their customers, and that this prevents Plaintiffs from bringing what Defendants characterize as an action complaining that Plaintiffs' supplier has entered into an "imprudent contract" with Western. Although this case may have begun as a challenge to CRC's authority to enter into this type of Settlement Agreement, it is clear that what is presented to this Court for review is a final Order of FERC. Therefore, it is unnecessary for this Court to determine whether the Nevada Statutes grant CRC the authority to enter into this type of Settlement Agreement. It is clear that the Nevada statutes do not prevent Overton/Valley from seeking review of a FERC decision.

### D. Overton/Valley have Standing to Challenge WAPA–49

■ Because there is no specific standing provision within the applicable statutes at issue in this case,[11] Plaintiffs' standing must be predicated on the Administrative Procedures Act ("APA") standing section, found at 5 U.S.C. § 702.

The Ninth Circuit has recognized three requirements in order for a plaintiff to have standing to initiate judicial review of agency action under the APA. *See Benally v. Hodel,* 940 F.2d 1194, 1198 (9th Cir.1990). First, the interest sought to be protected arguably must be within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Second, the plaintiff must allege an injury in fact by the action he seeks to have the court review. Third, the injury must be redressable by the court.[12]

This Court finds that Overton/Valley have standing to challenge the FERC's final approval and confirmation of WAPA–49.[13]

---

10. It is generally recognized that all defenses available to a promisor as against a promisee are available to the promisor as against the third party beneficiary. *See generally* Calamari & Perillo, *Contracts,* Chapter 17 (3d ed. 1987). This is of no avail to Defendants here, however, as Overton/Valley are not seeking to enforce the contract.

11. Judicial review of Department of Energy action is provided by 42 U.S.C. § 7192, section 502 of the Department of Energy Organization Act. Also, the Boulder Canyon Project Act provides a statute of limitations, codified at 43 U.S.C. § 619a(h). These sections, however, contain no guidelines for who has standing to bring suit. The other applicable statutes, the Hoover Power Plant Act of 1984 and the Boulder Canyon Project Adjustment Act, and the Federal Reclamation and Irrigation laws, contain no specific standing guidelines.

12. The *Benally* court indicated that "this test also satisfies the minimum standing requirements of Article III of the Constitution." *Benally,* 940 F.2d at 1198.

13. Somewhat hesitantly, Defendants have also advanced the argument that the Bureau of Reclamation is a necessary party to this lawsuit. This Court finds that Plaintiffs seek to challenge actions taken by Western, and the FERC Order confirming these actions. Thus, Reclamation is not a necessary party to this suit.

They seek to litigate various issues involved in the formulation of a rate charged for electricity produced at the Hoover Dam. This is most certainly within the zone of interests that the various regulations involved in this case seek to protect. *See* 10 C.F.R. § 903.21(a); 18 C.F.R. § 300.10(g) (both indicating that the rate charged must be the lowest possible rate consistent with sound business principles); DOE Order RA 6120.2 (setting forth the requirements for the Power Marketing Associations); and 51 Fed. Reg. 19744 (Delegation Order, requiring FERC to reject rates set by the PMAs if FERC finds the rates to be arbitrary or capricious, violative of DOE Order RA 6120.2, or are not the lowest possible rates consistent with sound business principles).

Overton/Valley also meet the second and third requirements. Overton/Valley's contract with CRC states that they will be charged the same rate for electricity as Western charges CRC. Thus, Overton/Valley alleges that FERC's approval of the rate set by Western forces them to pay a higher rate for electricity than they would be forced to pay if various administrative bodies had complied with the regulations. This is a sufficient allegation of concrete and particular injury to satisfy the second prong of the standing analysis. *See, e.g., National Wildlife Fed'n v. Burford,* 871 F.2d 849, 852 (9th Cir.1989). Finally, any injury to Overton/Valley is capable of being redressed by this Court, in the form of an Order striking FERC's Order that confirmed the rate, and remanding the issue to FERC for confirmation of a new rate formulated in conformity with the applicable statutes and regulations.[14]

## V. STANDARD OF REVIEW OF FERC'S ORDER

■ This Court reviews a FERC Order under the Administrative Procedures Act to determine if it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law."

*See Seattle v. FERC,* 923 F.2d 713 (9th Cir. 1991) (quoting *The Steamboaters v. FERC,* 759 F.2d 1382, 1388 (9th Cir.1985)); *Farley and Calfee, Inc. v. Dep't of Agriculture,* 941 F.2d 964, 966 (9th Cir.1991); *see also* 5 U.S.C. § 706(2). This Court's review of whether an agency's action violates a substantive law is *de novo,* in the sense that "plaintiffs who present proof that an agency has violated a statute have perforce shown that it has acted 'not in accordance with law' and 'in excess of statutory jurisdiction, authority, or limitation'." *J.L. v. Social Sec. Admin.,* 971 F.2d 260, 267 (9th Cir.1992) (quoting APA section 706(2)). This Court gives 'great deference' to FERC's interpretation of the law with which it is charged to administer. *Seattle v. FERC,* 923 F.2d at 713. Administrative constructions of a statute that are "inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement" will be rejected. *Southern Cal. Edison Co. v. FERC,* 770 F.2d 779, 782 (9th Cir.1985).

■ Judicial review of administrative action in some cases, however, may be precluded where agency action is committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). Although judicial review of administrative action is the rule and nonreviewability the narrow exception, *see Arizona Power Pooling Ass'n v. Morton,* 527 F.2d 721, 727 (9th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), there are circumstances in which statutes are drafted in such broad terms that in a given case there is no law to apply. *See Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The test under the APA for whether an agency action is committed to agency discretion by law is whether there is law for a reviewing court to apply. *See City of Santa Clara v. Andrus,* 572 F.2d 660, 666 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). "There is law to

---

**14.** The parties have stipulated (# 43), and this Court adopted as its findings per an Order entered December 2, 1992 (# 42), that the implementation of a new rate, such as WAPA–58, does

not preclude a refund if this Court determines WAPA–49 was calculated improperly and if FERC determines upon recalculation that a refund is due.

apply only if a specific statute limits the agency's discretion to act in the manner which is challenged." *Id.; see also Strickland v. Morton*, 519 F.2d 467 (9th Cir.1975) (where considerable discretion is committed by statute to an official, and when the plaintiff's complaint "fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent, ... absent some action *clearly* contradictory to a statutory provision or legislative intent", a court may not have jurisdiction to entertain a challenge to the agency's action) (emphasis in original); *County of Esmeralda v. Dep't. of Energy*, 925 F.2d 1216, 1218 (9th Cir.1991) ("under the [APA], an agency action is unreviewable when a statute commits the action to the agency's discretion, and 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'") (citation omitted).

■ There is ample authority that holds that even in the absence of a statute which provides a reviewing court with "law to apply," a court may review an agency action where that agency has promulgated regulations which themselves provide a meaningful standard of review. *See Schneider Nat'l Inc. v. ICC*, 948 F.2d 338 (7th Cir.1991) (citing *Arnow v. U.S. Nuclear Regulatory Comm'n*, 868 F.2d 223 (7th Cir.), *cert. denied*, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989), for the proposition that agency regulations that are mandatory in nature may provide a sufficient standard for a reviewing court to review an agency's action); *see generally Webster v. Doe*, 486 U.S. 592, 602 n. 7, 108 S.Ct. 2047, 2053 n. 7, 100 L.Ed.2d 632 (1987) (citing two prior Supreme Court cases which note that federal courts may review an agency's action to determine whether that agency followed its own regulations); *County of Esmeralda v. U.S. Dep't of Energy*, 925 F.2d 1216, 1222 (9th Cir.1991) (Wallace, C.J., dissenting) (noting that regulations can form the basis against which the Secretary's exercise of his discretion may be measured by a reviewing court); *MassPIRG v. U.S. Nucle-*

*ar Regulatory Comm'n*, 852 F.2d 9, 16 (1st Cir.1988) (agreeing with a decision of the D.C. Circuit in *Center for Auto Safety v. Dole*, 846 F.2d 1532 (D.C.Cir.1988), which held that an agency regulation may provide a reviewing court with a meaningful standard of review if the regulation imposes significant restraints on agency discretion and if the agency intended the regulation to be a binding norm). Of course, it is possible that the regulations at issue may themselves be such a broad grant of authority that they do not provide a meaningful standard for review. Thus, this Court must examine the regulations at issue in this case, and first determine if they provide a meaningful basis for review. If they do, this Court must then determine if FERC and DOE complied with the regulations.

## VI. PLAINTIFFS' CHALLENGES TO ACTION TAKEN BY FERC AND WESTERN

Plaintiffs challenge WAPA–49 on several grounds. First, they contend that Western violated 10 C.F.R. part 904, because they allege that Western failed to amortize the capital invested in replacement facilities over the useful life of the facilities, but instead recovered the costs of the replacements fully in the year incurred.[15] Second, Plaintiffs argue that this failure to amortize violated DOE Order RA 6120.2 ¶¶ 8, 10, and 12. The Department of Energy issued this Order to all PMAs. The Order established financial reporting policies, procedures, and methodologies for rate adjustments. Third, Plaintiffs contend that the use of "pinch-point" methodology to calculate the base rate for reimbursement of capital expenditures violates both Part 904 and the DOE Order. Fourth, Plaintiffs contend that Western improperly deferred the payment of uprater credits to each uprater program investor. They contend that 10 C.F.R. § 904.12(a) requires Western to abide by its contract with its Contractors, and that the contract between Western and each Contractor who was an uprater program investor called for prompt repayment of the uprater credits. Plaintiffs argue that Defendants expensed rather than

---

**15.** Recovering the costs of replacements fully in the year in which the costs are incurred is also referred as "expensing" the replacements.

amortized the costs of replacements in order to produce a sham deficit, which they then used to deny repayment of uprater credits. Fifth, Plaintiffs claim that Western failed to conduct periodic audits, as is required by ¶ 9 of DOE's Order. They contend that this failure has resulted in forcing Western to use data that has not been properly audited, leading to WAPA–49's unnecessary increase in the rate charged for electrical power. Sixth, Plaintiffs assert that Defendants violated 10 C.F.R. Part 903 by failing to allow access to data underlying WAPA–49. Seventh, Plaintiffs claim that WAPA–49 was based in part on expenditures for a new Hoover Dam Visitor Center that exceeded Congressional appropriations for this Visitor Center, and that this resulted in a violation of the requirement that the rate be the lowest possible consistent with applicable law.

A. Plaintiffs' Allegations That Western's Failure to Amortize Capital Investments Violated 10 C.F.R. Part 904 and DOE Order RA 6120.2

 This Court finds that Western's failure to amortize its capital investments is not arbitrary or capricious, does not constitute an abuse of discretion, and is not violative of law. First, it is unclear whether the DOE Order can be the basis for reviewing the agency action at issue here. The cases cited above stand for the proposition that agency *regulations* may provide a District Court with a meaningful standard through which to review agency action. These cases applied to regulations the general rule that an agency's action can be reviewed against a statute;

there is no indication that these courts would extend this rule to intra-agency directives, such as the DOE Order.

Second, even if this Court were to use the DOE Order as a standard against which to review Western's decision to expense rather than amortize, confirmed by FERC's Order, it would not hold differently. Plaintiffs urge this Court to construe DOE Order RA 6120.2 ¶¶ 8(b), 10(d), and 12(a) & (b) to require Western to amortize its capitalize its replacement costs.[16]

Paragraph 8(b) merely notes that "expenses shall be appropriately matched against period revenues." This section does not provide an independent basis for requiring DOE to amortize its replacement expenditures.

Although paragraph 10(d) seems to indicate that the repayment period usually will be set at the expected useful life of the facility, the only mandatory language in this section states that investments are to be recovered "within a period not to exceed 50 years." On its face, this language gives discretion to the PMA in setting the time frame for recovery of expenditures.

Finally, paragraph 12 notes that a current rate for power must be set such that the expected revenues are at least sufficient to recover "the cost of each replacement of a unit of property ... within its expected service life up to a maximum of 50 years...." This Court finds that this language does not compel amortization of expenditures made for replacements; recovery of such replace-

---

**16.** Paragraph 8 is entitled "the Accounting System", and subsection (b) is entitled "Accounting Concepts." Subsection 8(b) states: "Accounting concepts for PMAs shall be developed around, but not limited to, the following generally accepted principles." Subsection 8(b)(2) notes that "Expenses shall be appropriately matched against the periodic revenues."

Paragraph 10 is entitled "Power Repayment Studies." Subsection 10(d), labelled "Allowable Unamortized Investment," states "[e]ach increment of investment shall be carried as allowable unamortized investment for its repayment period in accordance with the following principles:

(1) Unless otherwise prescribed by law, each dollar of investment is to be repaid with interest within a period not-to-exceed 50 years. Repayment periods of less than 50 years may be established when the facilities involved have useful life expectancies of less than 50 years.

Such shorter repayment periods are appropriate for (a) replacement of power facilities and (b) transmission facilities which are developed and managed as transmission systems rather than as adjuncts to generating projects. In such cases, the expected useful life of the facility involved generally will be used as the repayment period. Such repayment periods may be adjusted from time to time, within the 50–year maximum, if changed conditions indicate a different estimated useful life expectancy.

Finally, paragraph 12 is entitled "Cost Recovery Criteria." It sets forth various requirements for recovering expenditures, including, but not limited to, the requirement that expected revenues be sufficient to recover operating and maintenance costs.

*See* DOE Order RA 6120.2, Defendants' Motion to Dismiss (# 44), Exhibit F.

ment costs in the same year in which the costs are incurred would satisfy this provision. This section directs that the cost of replacements be recovered within their expected life, and in any case, not later than 50 years. There is no prohibition against recovering the replacement costs on a more expedited schedule.

In refusing to hold that Western's decision not to amortize violates the DOE Order, this Court is mindful that, absent direction from the Courts of Appeal and from the Ninth Circuit in particular, it is doubtful that a DOE internal Order can serve as a meaningful standard for review of an agency decision. Even if it could, however, this Court finds that the lack of amortization did not violate the DOE Order.

 Western's recovery of replacement expenses in the year in which they are incurred likewise does not violate 10 C.F.R. § 904.5. Section 904.5(b)(5) directs Western to set a rate sufficient to recover "capital costs and Replacements" over the appropriate repayment periods set out in 904.5(c). Subsections (c)(1) and (2) specify 30–year recovery periods; subsections (c)(3)—(5) specify 50–year recovery periods. Nevertheless, although these sections permit recovery of costs over 30 or 50 year periods, there is no mandatory language indicating that Western must amortize to recover those costs no sooner than the end of those periods. The regulations require that Western recover the expenditures *no later than* the periods specified in the regulations. This regulation does not clearly direct Western to amortize its replacement costs, and permits Western significant discretion.[17] In the absence of such clarity, this Court will not disturb the decision made by Western, and affirmed by FERC.[18]

### B. Western's Use of Pinch–Point Methodology

 Overton/Valley argue that Western's

---

17. Plaintiffs also argue that Western's decision to expense replacements fails to produce the "lowest possible rate consistent with sound business principles," as is required by 10 C.F.R. § 903.-21(a), the Delegation Order (51 Fed.Reg. 19744 (1986)), and 18 C.F.R. § 300.10(g). This Court finds that this language is so broad as to preclude meaningful judicial review. *See Pacific Power & Light Co. v. Duncan*, 499 F.Supp. 672, 681–82 (D.Or.1980); *City of Santa Clara v. Andrus*, 572 F.2d 660, 666–68 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). The issue of whether to expense or capitalize replacement costs has been firmly committed to agency discretion, and as such, is not reviewable.

18. At oral argument, Overton/Valley called to this Court's attention an alleged acknowledgement by Defendants that the BCP statutes and regulations require amortization of capital expenditures. In a June 22, 1993, Report of Negotiating Group to the BCP Power Contractors ("Negotiating Group Report"), attached as Exhibit 1 to the Updated Status Report on Settlement Negotiations (# 89), that Group, of which Western, Reclamation, and various Contractors are a part, states that "[u]nder existing law, replacements are capital investments by the United States to be amortized over a 50 year period ..." Negotiating Group Report at 8. Furthermore, the "Task 1 Committee," a smaller subcommittee of the Negotiating Group, issued "Recommendations for Funding Replacements on the Boulder Canyon Project." These Recommendations are attached as Exhibit A to Exhibit 1 to the Negotiating Group Report (# 89). In recommending that Reclamation seek appropriations to pay for replacement expenses, the Task 1 Committee noted that "[t]he BCP statutes and regulations require that Replacement investments be recovered over 50 years." Overton/Valley urge this Court to recognize these statements as an admission by Defendants of their duty under the law to amortize rather than expense the costs of replacements.

These statements, however, do not represent the views of FERC. In its Order, FERC noted that "there is no requirement that Western make payments which annually amortize the investment in federal facilities." FERC Order at 7, n. 16. Further, FERC concluded that the DOE Order allows Western to repay replacement costs at any time during the lives of the equipment, and that, additionally, the expensing of replacements is supported by the DOE Order's policy of paying back first the expenditures that carry high rates of interest. Also, having undertaken an independent review of the statutes, regulations, and agency Orders concerning this issue, this Court agrees with FERC's conclusions. Although the statutory scheme appears to contemplate amortization, there is nothing to indicate a *requirement* that replacement costs must be amortized and not paid for in the year in which they are incurred. *See Stone Forest Industries, Inc. v. Robertson*, 936 F.2d 1072, 1074 (9th Cir. 1991) (agency's interpretation of its own regulations is entitled to a high degree of deference and should be upheld as long as it is not plainly erroneous or inconsistent with the language of the regulation); *see also Washington State Health Facilities Assoc. v. Dep't of Social & Health Srvcs.*, 879 F.2d 677, 681 (9th Cir.1989).

use of "pinch-point" methodology [19] in setting the power rate violates the DOE Order and various regulations. For the following reasons, this Court finds that the use of such methodology does not violate applicable regulations.

Plaintiffs contend that the use of pinch-point methodology results in Western's collection of excess revenue, more than is necessary to recover expenses and repay the federal investment in the Hoover Dam. FERC's Order confirming WAPA–49 responded to Plaintiffs' allegations. FERC noted that although the rate barely recovers "forecasted fiscal year 1995 expenses, it recovers more than the expenses in later years." FERC Order at 8. FERC further noted that in the years during which revenues exceed expenses, repayment of the federal investment in the Dam is accelerated until that investment is fully amortized. After the federal investment is paid off, FERC determined that Western would accrue a capital surplus if the rate were to remain in effect. FERC concluded that the anticipated surplus may never occur, because Western must file a superseding rate by 1996, and a lower rate would be instituted at that time. FERC also concluded that Western's rate was reasonable, in that Western chose to "develop its rates so that they are sufficient each year to recover costs expected during the period the rates are to be in effect," and that if Western charged a lower rate, it would run the risk of not being able to recover future costs.

This Court, mindful of the deference due to Western and FERC, finds that use of pinch-point methodology is not arbitrary, capricious, or otherwise in violation of law.

Plaintiffs argue that pinch-point methodology violates DOE Order ¶ 12(a) and (b), because surpluses violate those sections' requirement that the annual revenue to be sufficient to meet investment repayment requirements within the applicable repayment periods. This Court finds that the DOE Order does not prohibit pinch-point methodology. Similar to the analysis above, this Court interprets paragraph 12 as a requirement that Western set the rate to be sure that enough revenue will be collected to cover certain costs within a certain time period, where one such cost is the expense of replacements. Nowhere does paragraph 12 of the DOE Order prohibit the collection of surplus revenue. That paragraph tells Western what to collect at a minimum, but does not specify a maximum. Finally, the Court reiterates its reluctance to use an internal agency order as the standard against which to review that agency's action.

Plaintiffs also allege that pinch-point methodology violates 10 C.F.R. 904.7, and 903.21(a). This Court has already determined that 903.21(a)'s requirement that the rate be the "lowest possible consistent with sound business principles" does not provide a standard by which this Court may conduct a meaningful review of agency action.[20] *See* footnote 17, *supra.* Plaintiffs also assert that calculation of the rate using pinch-point methodology violates 904.7's directive to use the "estimated average annual revenue requirement developed pursuant to paragraphs (b), (c), and (d) of § 903.5 of these General Regulations ..." in developing a base rate. Plaintiffs argue that a rate calculated using pinch-point methodology violates section

---

**19.** Pinch-point methodology refers to Western's practice of setting the "base rate" for power around the year in which Western expects to have the highest revenue requirement, and collecting that rate for all other years for which the rate structure is in effect. WAPA–49 set the base rate around 1995. This means that 1995 is the year in which Western expects to have the highest expenditures, so it set the rate for the entire repayment period around that year. According to Plaintiffs, this methodology produces adequate revenue for the base year, but it also produces a surplus for every other year in which that rate is used.

**20.** Plaintiffs also argue that pinch-point methodology enables Western to accelerate repayment of capital investments and that this acceleration is an independent regulatory violation. Plaintiffs contend that the mandate to set rates as low as possible consistent with sound business principles requires Western to take advantage of the entire repayment period provided for in the regulations. This Court echoes its analysis found in footnote 16, in which it determined that it is unable to review an agency action for alleged non-compliance with a mandate to set rates "as low as possible consistent with sound business principles," for lack of any meaningful law to apply.

904.7 because it does not use an "average" annual revenue requirement, but instead bases the rate on the one year in which expected revenue is at its highest. The requirement of section 904.7 that the Base Charge be developed using the average annual revenue requirement developed pursuant to subsections (b), (c), and (d) is not an independent regulation intended to affect the calculation of the rate. Clearly, 904.7 contemplates the use of the rate as calculated pursuant to 903.5. Therefore, as this Court has already found that 904.5(b), (c), and (d) permit Western to set the rate based partly on expensing, and not amortizing, the cost of replacements, section 904.7 does not provide Plaintiffs with an independent basis on which to challenge the use of pinch-point methodology.

The gravamen of Plaintiffs' complaint with regard to the use of pinch-point methodology is that it produces surplus revenue in each year, except for the "pinch-point" year, and that this surplus violates the requirement that Western set the rate for electrical power at a figure no higher than is needed to pay expenses and repay the federal investment. Although many of the regulations and the DOE Order seem to contemplate amortization of replacement expenses over their useful life, there appears to be no regulation that clearly requires such amortization. As such, this Court concludes that this area was left to the discretion of the Secretary of Energy, who in turn left it within the discretion of the PMA's, his Under Secretary, and FERC. This Court will not overturn such discretion in the absence of clear abuse, and finds no such clear abuse present.

### C. Deferral of Repayment of Uprater Credits

██ Overton/Valley challenge Western's deferral of its obligation to repay CRC for monies CRC advanced to the Secretary of the Interior to fund the Uprating Program.[21]

Plaintiffs note that 10 C.F.R. § 904.12 states that "Funds advanced to the Secretary of the Interior for the Uprating Program ... shall be returned to the Contractor advancing the funds during the Contract period through credits on that Contractor's power bills." Plaintiffs further call to this Court's attention a provision in the contract for the sale of Hoover Dam power between Western and CRC. Paragraph 6.5 of this contract states:

> That a Schedule B Contractor [CRC] shall not receive any credits or portions thereof on its power bills for any Billing Period unless sufficient funds are legally available for (i) the payment of operation, maintenance, and replacement costs of the Boulder Canyon Project; (ii) repayments to the Treasury, with interest, of advanced or any readvances made to the Colorado River Dam Fund that may not be legally deferred; and (iii) in-lieu-of tax payments to the States of Arizona and Nevada."

*See* Exhibit 27, Plaintiffs' Motion for Preliminary Injunction (# 6).

Overton/Valley assert two independent grounds for finding that the deferral constituted a violation of this contract provision. First, Plaintiffs argue that if Western had amortized replacements over their useful life, Western would not have had a shortage of funds, and no deferral would have been necessary. Plaintiffs allege that the improper expensing of replacements resulted in a "sham deficit," which Western then used to justify deferral of Uprater Credits. Second, Plaintiffs acknowledge that the Contract between Western and CRC allowed for the deferral of credits if sufficient funds to meet the three requirements stated in the contract were not legally available. Plaintiffs, however, contend that sufficient funds in fact were legally available, and that therefore, deferral was improper.[22]

---

**21.** Although Congress appropriated money to "uprate" the energy producing capability of the Hoover Dam from 1,450,00 kilowatts to an estimated 1,818,000 kilowatts, *see* 43 U.S.C. § 617b, the actual funding for this uprating program came from the various Contractors, including CRC. It was agreed that the money advanced by the Contractors to pay for the uprating would be paid back to the Contractors in the form of "credits," used for the purchase of electric power.

**22.** Plaintiffs point to Section 5 of the Boulder Canyon Adjustment Act, codified at 43 U.S.C. § 618d, as support for their contention that funds were legally available. This section states:

> If at any time there shall be insufficient sums in the Colorado River Dam Fund to meet the cost of replacements, however necessitated, in

This Court expresses no opinion as to whether deferral of Uprating Credits was improper, because it finds it unnecessary to reach Plaintiffs' arguments. This action filed by Overton/Valley seeks to challenge the lawfulness of WAPA–49, a rate charged by Western for power produced at the Hoover Dam, and passed along to Plaintiffs through CRC. Defendants have provided the affidavit of David G. Shelton ("Shelton"), Director of the Division of Power Rates and Statistics for the Phoenix Area Office of Western. Shelton testified that "neither the PRS or any documentation filed in support of Rate Order WAPA–49 reflects any deferrals of Uprating Credits." Shelton Declaration at 2, ¶ 3, Defendants' Motion to Dismiss (# 44).[23] He noted that although the contract between Western and CRC provided that Western could suspend payment of Uprating Credits under certain conditions, it was only in June of 1991 that Western and Reclamation foresaw a need to defer such credits. Therefore, he reached the conclusion that because the need to defer was not anticipated when the PRS studies were being conducted, it is clear that any such deferral was not part of the calculation of WAPA–49.

To rebut this evidence, Plaintiffs point to Western's letter to the Contractors dated July 2, 1991, attached to the Revised PRS in support of WAPA–49. Plaintiffs cite language in the fourth full paragraph, in which Western states that "the actual payment anticipated to be made during FY 1991 will result in an increase of nearly $2 million in the Uprater Credit carry forward balance, rather than the decrease shown in the September study." Plaintiffs interpret this to be an admission by Western that the Uprating Credits were in fact deferred.

A review of Western's letter to the Contractors demonstrates that the Revised PRS increased WAPA–49 by approximately two percent above the rates indicated in the September, 1991 PRS. Western's explanation for this increase was that there was a reduction in FY 1991 revenue of $11 million. This reduction caused the Uprater payment to decrease, effectively causing an increase in the Uprater credit carry forward balance. There is nothing in Western's letter that indicates that the rate for power reflected in WAPA–49 was affected by the Uprating Credit repayment.

This Court expresses no opinion as to whether section 618d and the contract between CRC and Western was violated by Western's deferral of payment of Uprating Credits. There is no evidence that demonstrates that any such deferral, improper or not, played a role in the determination of WAPA–49.

### D. Western's Alleged Failure to Conduct Audits

Another ground on which Plaintiffs challenge the validity of WAPA–49 is Western's alleged failure to conduct periodic audits of the power system. Plaintiffs note DOE Order RA 6120.2 ¶ 9(f)'s requirement that:

> The financial statements and accompanying notes to the financial statements of each power system shall be examined periodically, with the period not to exceed 2 years, by independent auditors, the General Accounting Office, Inspector General, or other acceptable audit organization.

Plaintiffs further note that the DOE Order defines a "power system" as "a system comprised of one project or more than one project hydraulically and/or electrically integrated and therefore treated as one unit for the purpose of establishing rates." DOE Order RA 6120.2, ¶ 7(g). Plaintiffs conclude that under this definition, the Boulder Canyon Project constitutes a power system in and of itself. According to Plaintiffs, Defendants have produced evidence of an audit of BCP power system financial statements that took place on May 31, 1987, and a Combined Power System audit as of September 30,

---

addition to meeting the other requirements of this subchapter, or of regulations authorized hereby and promulgated by the Secretary, the Secretary of the Treasury, upon request of the Secretary of the Interior, shall readvance to the said fund, in amounts not exceeding, in the aggregate, moneys repaid to the Treasury pursuant to section 618a(b) of this title, the amount required for replacements, however, necessitated, in excess of the amount currently available therefore in said Colorado River Dam Fund.

**23.** See Part II, Section C, *supra*.

1991. Plaintiffs argue that the latter audit does not satisfy the DOE Order because it was not specific to the BCP, but was an audit of all thirteen power systems under Western's control. Finally, Plaintiffs argue that failure to comply with the two-year, BCP-specific audit requirement in the DOE Order forces Western to use unreliable data in the formulation of its rates.

Defendants admit that Western has not conducted a "separate and distinct audit of the BCP since 1987." *See* Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (# 51) at 13. Defendants claim, however, that "annual verifications," which they term "cross-walks," have been used to coordinate the power repayment studies with the results of BCP operations. Defendants also assert that extensive Western-wide audits were conducted in 1991 and 1992. These audits examined Western's statements of assets, federal investment and liabilities, revenues, expenses, accumulated net revenues, sources of funds, Western's internal control structure, and Western's compliance with laws and regulations. Defendants state that these audits were not done on a project level, but included all facilities for which Western markets power.

FERC declined to review Plaintiffs' claim that Western violated the auditing requirements in the DOE Order. In its Order Denying Motion for Rejection or Remand of Proposed Rates and Confirming and Approving Rates on a Final Basis ("Confirmation Order"), FERC noted Plaintiffs' claim that "Western resisted audit of its financial statements." *See* Exhibit B, Defendants' Motion to Dismiss (# 44), at 10. FERC concluded, however, that "its limited authority does not extend to the review of PMA ratemaking procedures which precede in time Commission review." *Id.* To support its conclusion, FERC cited one of its earlier decisions, *Salt Lake City Area Integrated Projects*, 57 FERC ¶ 61,212 at 61,697 (1991) ("*Salt Lake City*").

In *Salt Lake City*, a party requested FERC to review changes made in a power repayment study prepared by Western. Western apparently made the changes after the conclusion of its rate proceedings, but before the proposed rates were submitted to FERC for final confirmation and approval, as provided for in the Delegation Order. The party argued that FERC had in the past reviewed ratemaking procedures followed by a PMA prior to submission of the proposed rates to FERC for its final approval. FERC disagreed, and held that it was without authority to review the party's objections to procedures followed by Western in the preparation of the rates *prior to their submittal* to FERC for final approval of the rate.

This Court finds that it was in fact within FERC's authority to review Plaintiffs' claims that Western's auditing procedures violated DOE Order RA 6120.2. The Delegation Order clearly states that "the Commission [FERC] may reject decisions [made by the power marketing administrators] that are not in accord with (a) the standards set forth in DOE Order No. RA 6120.2 ..." See Delegation Order, 51 Fed.Reg. 19744 (May 30, 1986). FERC refused to review the allegations because, according to it, Plaintiffs were asking it to review Western's auditing procedures before the interim rate at issue was presented to FERC for final confirmation and approval. It is this Court's understanding, however, that the document in which FERC declined to review the allegations *was* FERC's confirmation and approval of WAPA–49. Therefore, Plaintiffs' request that FERC review Western's auditing procedures was presented to FERC after, not prior to, the submission of WAPA–49 for final confirmation and approval.

This Court expresses no opinion as to the validity of Plaintiffs' claims that Western's auditing procedures violated DOE Order 6120.2. The Court merely finds that it was within FERC's authority to review Plaintiffs' allegations. Therefore, this Court will grant Plaintiffs' Motion for Summary Judgment in part, in order to remand this case to FERC for the limited purpose of considering whether it wishes to exercise its power under the Delegation Order to determine if Western's auditing procedures violate DOE Order 6120.2, and if it determines that the DOE Order was violated, whether in light of this violation FERC considers it appropriate to

reconsider its decision to confirm and approve WAPA–49.[24]

### E. Western's Alleged Failure to Allow Access to Data

Overton/Valley claim that Western failed to provide copies of data that provided the underlying basis for WAPA–49. They allege that this failure constitutes a violation of 10 C.F.R. § 903.13(a)(3) and (b).

Section 903.13(a) states:

The Administrator shall give Notice that Proposed Rates have been prepared and are under consideration. The Notice shall include:

(1) ...

(2) ...

(3) The locations at which data, studies, reports, or other documents used in developing the Proposed Rates are available for inspection and/or copying.

Section 903.13(b) states:

Upon request, customers of the power system and other interested persons will be provided with copies of the principal documents used in developing the Proposed Rates.

At the heart of this grievance are two requests for information made by Plaintiffs in letters to Western dated January 8, and July 18, 1991. Western responded to these requests in a letter dated August 5, 1991. Western agreed to provide some of the information requested, and determined that other requests called for information either not readily available or not relevant to the establishment of WAPA–49. Plaintiffs assert that Western's decision to omit certain information violates section 903.13(b).

■ This regulation, though it compels Western to provide copies of "principal documents used" by Western in its development of the power rates, provides no law for this Court to apply to review Western's compliance with such regulation. It is clear to this Court that Western complied with many requests for information; it is unclear whether the information requested by Plaintiffs but refused by Western constitutes "principal documents." Because there is no law to apply, this Court concludes that such regulation grants unreviewable discretion to a PMA administrator to provide those documents the administrator determines are principal documents used in the development of the rates.[25]

Additionally, it appears that FERC's determination that such a review was beyond the scope of its authority was correct. Nothing in the Delegation Order gives FERC the authority to review a PMA's refusal to provide requested information, except, perhaps, if that PMA refused to provide any information whatsoever. *See* footnote 24, *supra.*

### F. Plaintiffs' Allegation That WAPA–49 was Based on Unauthorized Expenditures for the Hoover Dam Visitors' Center

■ Overton/Valley allege that the rate reflected in WAPA–49 was based, in part, on the recovery of improper expenditures made on the new Hoover Dam Visitor Center. They call to this Court's attention section 2 of the Boulder Canyon Project Act, codified at 43 U.S.C. § 617b, in which Congress appropriated an additional $77,000,000 for the Hoover Dam facilities, over and above the $165,000,000 previously appropriated.[26] The statute states that the $77 million "represents the additional amount required for the uprating program and the visitor facilities program." Both parties agree that no federal funds were used in the uprating program. Defendants state that the current cost of the Visitor Center as presented in the FY 1993 budget is $75 million, and that the "authorized appropriate ceiling indexed to October 1992 prices is over $100 million". See Decla-

---

24. Note that the Delegation Order does not require FERC to reject a PMA decision that violates DOE Order 6120.2, but rather states that FERC "may reject decisions that are not in accord with" the standards set forth in the DOE Order.

25. This Court could perhaps review the complete failure to provide any information at all, under the regulation's mandate to provide principal documents. The regulation, however, provides this Court with no guidance to determine what constitutes such a principal document.

26. The statute provides that this $77 million is calculated at October 1983 price levels. It also provides that the $77 million shall be adjusted to reflect changes in construction costs.

ration of Blaine D. Hamann, Defendants' Motion to Dismiss (# 44). Plaintiffs argue that the PRS projects costs of the Visitor Center to be approximately $84.5 million, and that this has increased since a 1986 projection of $46.1 million. Plaintiffs contend that Congress' appropriation of the $77 million was based on an October 1983 estimate of $32 million for the Visitor Center, and $45 million for the uprating program. Thus, they argue that Western's projected expenditure far exceeds authorized Congressional appropriation, and therefore, a rate based partially on an intention to repay the excessive expenditures must itself be unlawfully excessive.[27]

Based on section 617b and the figures presented by both parties, this Court cannot find that the projected expenditures for the Visitor Center exceeded Congressional authorization. The statute that authorizes the appropriation contains no directions as to the amount to spend on the Visitor Center and the amount to spend on the uprating program. Congress apparently left that decision to the Department or its agency which oversees the construction of the Hoover Dam facilities.[28] Plaintiffs have not called this Court's attention to any statute or regulation that prohibits Reclamation from spending the appropriation contained in section 617b for Visitor Center construction.

## VII. CONCLUSION AND ORDERS

Based upon the foregoing discussion, this Court concludes that there exists a limited basis on which to remand these proceedings to the Federal Energy Regulatory Commission. Additionally, although this Court finds it appropriate to deny Defendants' Motion to Dismiss, it also finds it appropriate to Grant Defendants' Partial Summary Judgment on all issues other than that remanded to FERC.

IT IS THEREFORE ORDERED THAT Defendants' Motion to Bifurcate (# 53) is denied.

IT IS FURTHER ORDERED THAT Plaintiffs' Cross–Motion for Summary Judgment (# 46) is granted in part, limited to section D of Part V of this Order, and that this matter shall be remanded to the Federal Energy Regulatory Commission for action consistent with section D of Part V of this Order.

IT IS FURTHER ORDERED THAT Defendants' Motion to Dismiss (# 44) is denied.

IT IS FURTHER ORDERED that Defendants' Alternate Motion for Summary Judgment (# 44) is Granted as to all issues other than that which has been Remanded herein.

IT IS FURTHER ORDERED THAT leave to file a brief amicus curiae by the California group (# 60) is denied.

IT IS FURTHER ORDERED THAT leave to file a brief amicus curiae by the Arizona Power Group (# 79) is granted.

IT IS FURTHER ORDERED THAT Plaintiffs' Motion for Authorization to file a Surrebuttal (# 63) is granted.

IT IS FURTHER ORDERED THAT Plaintiffs' Motion to file an Amended Verified Complaint (# 34) is granted.

---

27. This argument requires an understanding of the relationship between Western and Reclamation. Western is responsible for selling the power produced at the Dam, setting the rates for such power at a level sufficient to pay for operations, maintenance, replacement, and principle and interest on investment, and collecting payments from the Contractors. Reclamation is responsible for the Dam and for the power generating activity. Reclamation provides Western with Reclamation's yearly budget information. As over 80% of the Project's expenses are associated with activities for which Reclamation is responsible, Western must consider budgetary information provided by Reclamation. Information about Reclamation's budget, and to a smaller extent, information about Western's own budget, alerts Western as to the amount of expenditures it should calculate on recouping when it sets the rate.

28. The legislative history cited by Plaintiffs, S.Rep. No. 98–137, 98th Cong., 1st Sess. (1983), does not establish that Western has committed a violation by using the money appropriated in section 617b for the Visitor Center, because the Uprating program was funded privately. In fact, Congress was apparently aware that most of the funding for the uprating program would not come from the Federal Government. See S.Rep. 98–137, 98th Cong., 1st Sess. 14 (1983) (noting that "it is anticipated that the major portion of the funding for uprating will come from the States or public entities benefitting from the uprating program").

IT IS FURTHER ORDERED THAT Plaintiffs' Motion to Strike Declarations submitted in support of Defendants' Motion for Summary Judgment (# 48) is denied.